UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEAN BRISTER and ELIZABETH
JEUP,

       Plaintiffs,

v.

MICHIGAN BELL TELEPHONE
COMPANY,

       Defendant.

Case No. 14-cv-11950
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [29]**

---

Plaintiffs Sean Brister and Elizabeth Jeup are former managers at an AT&T call center operated by Defendant Michigan Bell Telephone Company in Port Huron, Michigan. They claim that Michigan Bell constructively discharged them in retaliation for their refusal to target for discipline and termination employees who exercised their rights under the Family and Medical Leave Act ("FMLA") or Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"). Michigan Bell says that Plaintiffs cannot prove that they engaged in protected activity under either statute, nor can they prove they were constructively discharged. For these reasons, Michigan Bell moved for summary judgment. Even assuming that Jeup could pass these hurdles, she has not established causation and therefore Defendant is entitled to summary judgment on both of her claims. However, a reasonable jury could find that Brister has made out a prima facie case of FMLA and PWDCRA retaliation, so her claims will survive summary judgment.

## I.  FACTUAL BACKGROUND

### A.

Michigan Bell provides telecommunications services under the AT&T brand. (Dkt. 29-29, Geoffrey Lee Aff. at ¶ 5.) The company operates a customer service and sales call center in Port Huron, Michigan. (*Id.*) The call center is staffed with service representatives who are trained to identify and resolve service or product related customer needs. (Dkt. 29-32, Elizabeth Jeup Dep. at 150.) Primarily, the representatives respond to customers who call to cancel or change their service. (*Id.*)

### B.

Geoffrey Lee was the General Manager of the Port Huron Call Center from 2010 through February 2015. (Lee Aff. at ¶ 6.) The General Manager supervises a hierarchy as follows: (1) Center Sales Manager ("CSM"); (2) First-Level Coach Managers; and (3) Service Representatives. (Jeup Dep. at 20; Dkt. 33, Brister Dep. at 27.) A CSM "[m]anages, directs, and supervises sales coaches or sales managers," "[d]evelops [a] business plan to achieve . . . operational goals," and "[c]ounsels and advises subordinates regarding performance and discipline." (Dkt. 29-9, Brister Job Description.) A First-Level Coach Manager "[p]rovides feedback, coaching, training, motivation, and support to [service] representatives. . . . Makes suggestions and recommendations as to the hiring, firing, advancement, promotion, and other status changes for employees under their supervision." (Dkt. 29-2, Jeup Job Description.) All evaluations for service representatives, coaches, and CSMs are based on objective metrics and tracked on a monthly scorecard. The representatives' scores "roll up" to their coaches' scorecards. (Brister Dep. at 54–55.) Employees can be subjected to discipline based on their scorecard results.

Plaintiffs allege that Lee initiated a practice of targeting for discipline and termination any employee using FMLA or disability leave. Many of the Port Huron call center employees testified to this practice in their depositions. Manager Jennifer Klein stated that "[t]he directive was that we were to target FMLA users." (Dkt. 30-5, Jennifer Klein Dep. at 243.) She was told to target several employees, including one who suffered from IBS and another who had migraines. (*Id.* at 243, 247.) Klein ultimately filed an Equal Employment Opportunity Complaint regarding the alleged FMLA targeting. (*Id.* at 254–57.) Manager Tracy Domozik testified that upper management wanted to avoid rewarding FMLA leave users because there was already a significant attendance problem in the Port Huron branch. (Dkt. 30-6, Tracy Domozik Dep. at 27–29.) She said that Lee had a list of representatives who had taken FMLA leave, and that is how he knew which representatives to target. (*Id.* at 78.) Joseph Goin also testified that he targeted FMLA users at Lee's direction, and that Lee stated, regarding a FMLA user, something to the effect of "if they don't want to be here, we need to find them something else to do . . . it's evident that Mr. Cole does not want to be here." (Dkt. 30-11, Joseph Gouin Dep. at 78.) Myrna Reynolds testified that she told Lee and his associate Frank Mayberry that it would be illegal for her to target a FMLA user for termination, but that Mayberry responded by "ask[ing] [her] if [she] understood it was either [her] job or their job[.]" (Dkt. 31-12, Myrna Reynolds Dep. at 73.)

Employees under Brister's supervision also testified that they had concerns about the directive to target FMLA users. CSM Sara Bawol, who worked under Brister, testified,

> We were going over my team results, and Geoffrey [Lee] told me that my numbers had been slipping and that I had a lot of people, it appeared, on my team that used FMLA, a lot of FMLA. . . . And he told me I needed to figure out how to vote those people off the island because they were impacting me, impacting the office, and it was either going to be them or me. . . . I did give pushback because FMLA is protected time.

3

(Dkt. 30-13, Sara Bawol Dep. at 42.) Jill Lendon, another CSM who reported to Brister, testified that "in most cases, if there was any type of corrective action or anything like that to be done, the question always asked, 'Does that rep use FMLA' prior to making the decision on what was to be done to that rep." (Dkt. 30-9, Jill Lendon Dep. at 44.) She also stated, "It was my understanding that it was any reps that used FMLA was considered an FMLA abuser." (Id. at 59–60.)

**C.**

Plaintiff Sean Brister worked at the Port Huron call center from 2002 to her resignation on March 6, 2013, achieving the position of CSM. (Brister Dep. at 124.) From 2009 until her resignation, she reported directly to Lee. (Brister Dep. at 27.) On March 8, 2012, Brister received an unfavorable performance review for 2011. (Dkt. 29-13, Brister 2011 Review.) Lee stated that "very poor attendance and less than satisfactory sales revenue and unit performance" impacted Brister's performance and the overall performance of the Port Huron call center. (*Id.* at 3.) He commented that Brister "lacked consistency to drive sustainable changes with her coaches" and that she would need to "hold her coaches more accountable[.]" (*Id.*) Brister received a "Does Not Meet [Expectations]" for her Overall Performance Rating. (*Id.* at 4.) In February 2013, Brister received another "Does Not Meet" evaluation for her performance in 2012. (Dkt. 29-14, Brister 2012 Review.) Brister responded to the evaluation: "I agree that my team did show inconsistent overall results in 2012. This was due in vast majority to the inconsistent attendance of the hourly employees." (*Id.* at 5.) As a result of these evaluations, Lee initiated a Pre-performance Improvement Plan to address Brister's "inconsistent" performance. (Dkt. 29-15, PIP.) Brister says that it was inappropriate for Lee to put her on a PIP because he did not follow AT&T's required progressive discipline steps. (Brister Dep. at 261–62.)

4

Brister claims that Lee's performance evaluations were not objective. First, she says that in every performance review from 2010 until her resignation, Lee told her that she "did not do a sufficient job at, you know, targeting or removing the people from the business that used FMLA or disability." (Brister Dep. at 256.) Brister also claims that Lee directed her to engage in deceptive sales practices, and her refusal to follow the directive was the real reason for her low performance evaluations. (Resp. Br. at 7.) For example, she says that managers were told to "[p]ut things on the [customers'] accounts that shouldn't be on there, to use a save credit [a credit for when a representative convinced a customer to retain AT&T service instead of disconnecting] where a save credit was not due, to convince a customer to disconnect only to get a save." (Brister Dep. at 196.) Jennifer Klein, another former CSM, testified that she was also directed to engage in deceptive sales practices. (Dkt. 30-6, Jennifer Klein Dep. at 292–94.)

On March 6, 2013, Brister resigned. (Brister Dep. at 165.) In an e-mail to other call center employees, Brister stated, "As you all may know my husband had a stroke last month and it has made me reevaluate the things that are treasured in my life." (Dkt. 29-21, Brister E-mail at 1.) But prior to this, Lee had sent Brister an e-mail presenting Brister with the following options: (1) "[C]ontinue your employment as Center Sales Manager – Port Huron and continue the active management process"; (2) "Accept a level 1 Sales Coach Manager position in Port Huron"; (3) "Voluntary resign from the company [with certain benefits.]" (Dkt. 29-19, Lee March 5, 2013 E-mail.). Brister said that she did not want to take the first option because she would still have to "target[] the employees on FMLA and disability[.]" (Brister Dep. at 138.)

**D.**

Plaintiff Elizabeth Jeup began working for AT&T in 1999. (Jeup Dep. at 17.) She worked as a Level 1 Coach Manager at the Port Huron Call Center starting in 2008. (Jeup Dep. at 30.)

5

She resigned from her employment in 2011. (Jeup at 17–19.) At that time, her direct supervisor was Cheryl Keeling. (*Id.* at 73.) In a June 2011 meeting with Lee, several coaches expressed that they were having problems with Keeling. (*Id.* at 73–74; Dkt. 29-34, Jamie Proctor Dep. at 35–36.) Jeup said that Keeling was picking on her, but it is unclear whether she expressed a reason she thought Keeling was picking on her. (Jeup at 112.) Lee met with Keeling and told her about the complaints. (Dkt. 29-30, Jeup EEO Hotline Report.) He did not receive further complaints about Keeling after this meeting.

Jeup sent her two weeks' notice to Lee via e-mail on August 19, 2011. (Dkt. 29-6, Jeup Resignation.) She wrote, "Please except [sic] my apologies for sending this to you instead of following the normal chain of command. I am in a current situation where I am unable to communicate with my immediate supervisor. Please except [sic] this e-mail as my 2 weeks' notice." (*Id.*) The next day, on August 20, 2011, Jeup submitted a complaint to the Company's internal EEO hotline. (EEO Hotline Report.) She stated that Keeling was "verbally abusive" to her and other coaches for "unknown reasons[.]" (*Id.* at 1.) The hotline complaint triggered an internal investigation with HR personnel speaking to Jeup, two of her peer coaches, Keeling, and Lee. (*Id.*)

While Jeup did not assert any particular reason for Keeling's conduct in the report, her deposition testimony suggests one:

> The last five months that I was there, I was told that that was not necessary, that I needed to remove people from the business who used FMLA time or disability time because I could not survive very long with a team like that. . . . I had heard it over the years from Geoffrey Lee that we needed to move people out of the business that used FMLA or medical disability time. The last meeting I had with Geoffrey Lee and Cheryl, they both said it. It's you or them.

(Jeup Dep. at 22–23.)

6

Lee avers that Jeup's peers told him she had been saying for the last year that the job was not for her. (Lee Decl. ¶ ) Jeup responds that she was unhappy in the job because she was being told to "play the game[.]" (Jeup Dep. at 104.) However, Jeup admitted in her deposition that nobody ever told her what "play the game" meant explicitly. (Id. at 103.)

### E.

Plaintiffs filed suit in this Court on May 15, 2014. (Dkt. 1.) Since then, two of the four named Plaintiffs—Kelly Ashford-Porter and Lynda Howard—dismissed their claims to pursue binding arbitration. (Dkt. 17.) Defendant filed its motion for summary judgment on Brister and Jeup's claims on May 29, 2015. (Dkt. 29.) After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motion. *See* E.D. Mich. LR 7.1(f)(2).

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-movant, here Barrett. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a

7

jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

## III. ANALYSIS

Defendant challenges Plaintiffs' ability to prove they engaged in activity protected by the FMLA and PWDCRA, whether they were constructively discharged, and any causal connection between the two. Plaintiffs counter that they have presented direct evidence that they were discharged in retaliation for their opposition of the illegal FMLA-targeting directive. After assessing both the type of evidence offered by Plaintiffs and whether they have met their burden under the applicable analysis, the Court concludes that Brister's claims survive summary judgment but Jeup's do not.

### A. FMLA Retaliation

The FMLA enables employees covered by the Act to take up to twelve weeks of leave per year for various health-and-family-related purposes specified in the statute. 29 U.S.C. § 2612(a)(1)(D). An employee returning from FMLA leave must be reinstated to her old position or to a position equivalent in pay, benefits, and other terms and conditions of employment. 29 U.S.C. § 2614(a)(1). "The 'retaliation' or 'discrimination' theory" of FMLA liability, which Plaintiffs assert here, "prohibits an employer from discharging or discriminating against an employee for 'opposing any practice made unlawful by' the Act." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007); 29 U.S.C. § 2615(a)(2).

The Court's analysis of an FMLA retaliation claim on summary judgment depends on the type of proof the plaintiff has offered. On the one hand, "[a]bsent direct evidence of unlawful

conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Bryson*, 498 F.3d at 570. On the other, "[i]t is well settled that if a plaintiff presents direct evidence of discrimination, she need not proceed under the McDonnell-Douglas" burden-shifting analysis. *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381–82 (6th Cir. 2002).

Because of these diverging modes of analysis, the Court evaluates each Plaintiff's claims individually. The Court finds that Brister has offered direct evidence of discrimination and has raised a genuine issue of material fact as to constructive discharge. On the other hand, the Court finds that Jeup has not offered direct evidence of discrimination and that her claim fails at the prima facie stage of the *McDonnell-Douglas* framework.

### 1. Plaintiff Brister

 Brister has presented direct evidence that the challenged employment action—constructive discharge—was motivated "at least in part" by prejudice against those who opposed the directive to target FMLA leave-users. "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. The evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [the FMLA], but also that the employer acted on that predisposition." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008) (citing *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)).

"Discriminatory remarks by decision makers and those who significantly influence the decision-making process can constitute direct evidence of discrimination." *Sharp v. Aker Plant*

*Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013). However, if comments "only lead to a conclusion of discrimination after numerous inferences and assumptions are made, they are not 'direct evidence' of discrimination as a matter of law." *DeMasellis v. St Mary's of Michigan*, 506 F. App'x 435, 436 (6th Cir. 2012). For example, in *Daugherty*, the Sixth Circuit held that a comment by the plaintiff's immediate supervisor (who was also a decisionmaker at the company) that "if [plaintiff] took his final FMLA leave, he would not be allowed to return to work" was direct evidence of FMLA retaliation. 544 F.3d at 708.

Brister testified that during three consecutive performance reviews (i.e. annual reviews that create a basis for employment actions), Lee told her that she "did not do a sufficient job at, you know, targeting or removing the people from the business that used FMLA or disability." (Brister Dep. at 256.) Brister's last performance review with Lee occurred on February 6, 2013. (Brister 2012 Performance Review.) And only a month later, on March 5, 2013, Lee sent Brister the e-mail on which Brister bases her constructive discharge argument. (Lee Mar. 5, 2013 E-mail.) In the e-mail, Lee explicitly stated that the e-mail was a "summary of the multiple conversations between us and human resources representatives over the last several weeks." (*Id.*).

Like in *Daugherty*, Lee is a decisionmaker at Michigan Bell as well as Brister's supervisor, as evidenced by his signature on Plaintiffs' performance evaluations and his e-mail to Brister presenting her with future employment options at Michigan Bell. Moreover, the Court finds that the comments during the February 2012 performance review are sufficiently connected to the February 2012 e-mail to provide "a window into the mind of an employment decision maker." *Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 799 (6th Cir. 2013). That is, the

comments are both "temporally [and] topically related" to the alleged constructive discharge. *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012).

Adding support to this conclusion is Brister's deposition testimony that she continuously defied Lee's directive:

> Q: [W]hat did you do, if anything, to oppose [Lee's] directive?
>
> . . .
>
> A: Basically I treated all my employees the same way. I didn't target employees that were on disability or FMLA. I assured that all my employees had the training they needed to succeed.
>
> Q: All right. Did you refuse to target employees who were on FMLA or medical disability?
>
> . . .
>
> A: Yes.

(Brister Dep. at 255.)

Because Brister presented direct evidence of discrimination, she "does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to [Defendant] to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Daugherty*, 544 F.3d at 707 (citation omitted). But first, the Court must decide whether Brister has presented sufficient evidence that she was constructively discharged—because otherwise there is no adverse action.

"To demonstrate a constructive discharge, [a] [p]laintiff must adduce evidence to show that (1) the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person, and (2) the employer did so with the intention of forcing the employee to quit," and (3) the employee actually quit. *Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 568–69 (6th Cir.

2001)). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (citations omitted). It is undisputed that both Brister and Jeup resigned.

As to the first prong of the constructive-discharge test, the Sixth Circuit has found the following factors to be "relevant, singly or in combination" to the inquiry:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a [male] supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. . . . Additionally, although we have held that a threat of demotion standing alone does not constitute a constructive discharge we have concluded in the past that a threat of demotion coupled with other factors is sufficient to establish constructive discharge.

*Saroli*, 405 F.3d at 451.[1]

Brister has offered evidence sufficient to allow a reasonable juror to find that she was constructively discharged. She received an e-mail from Lee giving her the following options:

> (1) "[C]ontinue your employment as Center Sales Manager – Port Huron and continue the active management process";

> (2) "Accept a level 1 Sales Coach Manager position in Port Huron";

---

[1] Defendants, relying on *Trepka v. Bd. of Educ. of the Cleveland City Sch. Dist.*, 28 F. App'x 455 (6th Cir. 2002), argue that Plaintiffs must show that the conduct contributing to the constructive discharge must have been motivated by retaliatory intent to be actionable under FMLA. (Def.'s Resp. Br, at 17.) In *Trepka*, an Americans with Disabilities Act case, the Sixth Circuit held that "conduct that forces an employee to quit, constituting 'constructive discharge,' is actionable only if the conduct is motivated by discriminatory intent against a protected employee characteristic." *Trepka*, 28 F. App'x at 463. Courts have applied this additional requirement in the Title VII context. *See Bond v. Sodecia N.A., Inc.*, No. 12-CV-15160, 2014 WL 2864895, at *8 (E.D. Mich. June 24, 2014) (race discrimination); *Starks v. W. Meade Place, LLP*, No. 3:05-0442, 2006 WL 2827420, at *7 (M.D. Tenn. Sept. 28, 2006) (gender discrimination). However, recent Sixth Circuit cases have merely cited the *Saroli* standard, which requires only that the employer intend that the employee resign. *See, e.g., Hurtt v. Int'l Servs.*, Inc — F. App'x —, No. 14-1824, 2015 WL 5332531, at *5 (6th Cir. Sept. 14, 2015); *Festerman*, 611 F. App'x at 320; *Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 301 (6th Cir. 2015); *Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 494 (6th Cir. 2015).

(3) "Voluntary resign from the company [with certain benefits.]"

(Lee March 5, 2013 E-mail.) The last two options—a demotion to a lower-level position or encouragement to resign—coupled with evidence that Lee's dissatisfaction with Brister's performance stemmed from her refusal to target FMLA users, would allow a reasonable jury to find that Brister's working conditions were intolerable. *See Saroli*, 405 F.3d at 452 (threats of demotion coupled with pressure not to take maternity leave were sufficient to create fact issue as to constructive discharge). It is true that Lee offered Brister the option to remain in her position as Manager. But a reasonable jury could conclude that remaining in a position where performance would be evaluated, at least in part, based on whether Brister took part in an illegal directive (as evidenced by Lee's comments during her performance reviews), would be intolerable.

As to the second prong of the test, "[i]ntent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions." *Festerman*, 611 F. App'x at 321–22 (6th Cir. 2015) (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). As noted above, Brister's continued refusal to target FMLA users, combined with other employees' resistance to the practice as illegal, could allow a reasonable jury to conclude that Lee was on notice that Brister opposed the continuing directive to target FMLA users but that Lee continued to pressure her to do so. Thus, it was a foreseeable consequence that given the options to (1) continue to refuse to target FMLA users in her position as manager; (2) take a demotion; or (3) resign, a reasonable employee in Brister's position would quit.

Because Brister has established through direct evidence that Lee had a discriminatory motive and acted on it by constructively discharging her, "'the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the

impermissible motive.'" *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 432 (6th Cir. 2014) (citation omitted).

Defendant has presented evidence that Lee gave Brister the options because of her poor performance ratings and "because she was not consistently holding her employees accountable." (Dkt. 31, Def.'s Reply Br. at 6.) However, it is clear that the poor performance ratings were tied to employee attendance: Brister's 2012 MidYear evaluation stated, "the root of [the] problem continues to be a chronic attendance problem in her work group." (Brister 2012 Performance Review at 4.) Given that an employee taking FMLA leave would not be present at work, a reasonable jury could conclude that the "attendance problem" cited in Brister's reviews was really an issue of FMLA leave. Moreover, it is unclear from the record whether the attendance issues were the result of absenteeism or FMLA-qualifying leave—or whether Lee differentiated the two when evaluating the attendance problems. This is troubling given that evaluating Brister's performance based on the absence of employees out on FMLA-approved leaves would likely be violation of the FMLA. *See* 29 C.F.R. § 825.220.

Because Brister has presented direct evidence of FMLA discrimination and there is a genuine issue of material fact as to whether she would have still been presented with the three options had Lee not known about her opposition to the FMLA-targeting directive, summary judgment is inappropriate.

Although the Court believes that Brister has successfully provided direct evidence of retaliation, there is also sufficient evidence to support her claim under the *McDonnell Douglas* analysis. An employee can establish a prima facie case of retaliation by showing that (1) she engaged in protected activity, (2) her employer was aware of the protected activity, (3) she was subject to an adverse employment action, and (4) there was a causal nexus between the protected

activity and the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). A reasonable jury could conclude that Brister opposed Lee's directive because he commented on her refusal to target FMLA users in her performance review, there is a genuine issue of material fact as to constructive discharge, and the timing and context of the comment establishes causation.

### 2. Plaintiff Jeup

The Court finds that Jeup has not presented direct evidence of discrimination. Jeup said that she was told by Lee and Keeling that she had to "play the game" and "it's you or them." (Jeup Dep. at 23.) She has also identified at least one other employee who testified to being told the same thing, Myrna Reynolds. (Reynolds Dep. at 73.) However, Jeup admits that she was never told what "play the game" meant, nor did she say that she believed the phrase to be a reference to FMLA or the PWDCRA. Instead, she testified that she thought that "play the game" meant that she should do whatever it took to make a sale. (Jeup Dep. at 149–50.) These ambiguous comments are not direct evidence that prejudice against employees who refused to target FMLA leave-takers motivated the challenged employment action against Jeup. Indeed, a jury could find that Lee and Keeling were telling Jeup that she needed to be more aggressive in making sales in order to improve her performance. *See Curry v. Brown*, 607 F. App'x 519, 523 (6th Cir. 2015) (holding that a comment by a supervisor that plaintiff "needed to focus on her health problems, transfer to Burlington and it would be less stressful," could be interpreted as an attempt to offer advice rather than express FMLA discrimination and therefore could not be direct evidence of FMLA retaliation). Accordingly, Jeup must proceed under the *McDonnell-Douglas* burden-shifting approach.

"An FMLA retaliation claim based solely upon circumstantial evidence of unlawful conduct is evaluated according to the tripartite burden-shifting framework set forth in *McDonnell Douglas*." *Daugherty*, 544 F.3d at 707. Therefore, Jeup has the initial burden to establish that "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (citation omitted). If the plaintiff establishes a prima facie case, "the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale" for the adverse action. *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). If the employer does so, the plaintiff must produce evidence that "the alleged nondiscriminatory rationale was in reality a pretext designed to mask discrimination." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

*Protected Activity*

Jeup is in the "unusual position of seeking protection under the FMLA even though [she] never actually sought medical leave under the Act." *Karibian v. Village Green Management Co.*, No. 06-cv-14989, 2008 WL 192259, at *4 (E.D. Mich. Jan. 23, 2008). Instead, she relies on the statute's prohibition on retaliation against employees who "oppos[e] any practice made unlawful by the act." 29 U.S.C. § 2615(a)(2).

Plaintiffs have offered ample evidence and briefing to establish a genuine issue of material fact as to whether they had a good-faith belief that Defendant had a policy or practice of violating the FMLA. *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312–13 (6th Cir. 1989) ("A person opposing an apparently discriminatory practice does not bear the

16

entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful."). Numerous employees testified that they were asked to target FMLA and disability users for termination and disciplinary action, and the taking of FMLA or disability leave regularly figured into other employment decisions such as promotions. Such a practice would be illegal under FMLA. 29 C.F.R. § 825.220 ("[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions[.]"); *Fields v. Fairfield Cty. Bd. of Developmental Disabilities*, 507 F. App'x 549, 555 (6th Cir. 2012). So the question is whether Jeup engaged in activity to oppose this illegal practice.

Courts applying Title VII's opposition clause, which has similar phrasing as FMLA's,[2] have stated that "[a]n employee may not invoke the protections of the Act by making a vague charge of discrimination." *Fox v. Eagle Dist. Co., Inc.*, 510 F.3d 587, 589 (6th Cir. 2007) (applying Title VII case law to an ADEA retaliation claim). The employer must be on notice of the employee's complaints, and the complaints must be specific to FMLA. *See Deloatch v. Harris Teeter, Inc.*, 797 F. Supp. 2d 48, 68 (D.D.C. 2011) (collecting cases); *see also Gruppo v. FedEx Freight Sys., Inc.*, 296 F. App'x 660, 663–64 (10th Cir. 2008) (affirming a grant of judgment as a matter of law to the defendant-employer in a FMLA-retaliation claim where "there was no evidence that [plaintiff] informed defendants that he thought what they were proposing to do to [an employee returning from FMLA leave] was illegal because it was contrary to the FMLA, or even more generally, because it interfered with the employee's right to take specific amounts of unpaid medical leave without suffering adverse employment consequences.").

---

[2] Title VII's opposition clause reads: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C.A. § 2000e-3(a).

The Supreme Court "would call it 'opposition' if an employee took a stand against an employer's discriminatory practices not by 'instigating' action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons." *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 277 (2009). In a concurring opinion, Justice Alito stated his view that "whether the opposition clause shields employees who do not communicate their views to their employers through purposive conduct" was still an open question. *Id.* at 283 (Alito, J., concurring). However, "Justice Alito did not suggest that employees must verbally express their views[.]" *Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 47 (1st Cir. 2010) (citing *Crawford*, 555 U.S. at 283 (Alito, J., concurring)).

Jeup has not raised a genuine issue of material fact as to protected activity. True, Jeup testified that she did not follow Lee's directive:

> Q: In paragraph 60 [of the Complaint], you allege that you opposed the alleged directive to target Michigan Bell employees with disabilities who were on company approved FMLA disabilities and medical leaves of absences. What activity do you claim you engaged in to oppose that alleged directive to target employees?
>
> A: I didn't do it.
>
> Q: So meaning you didn't target any employees because they used FMLA leave or had disability benefits?
>
> A: Correct.

(Jeup Dep. at 125.) But Jeup has not identified any portion of the record to show that she informed her employer that she opposed the directive as illegal under FMLA. In fact, when she made her complaint about Keeling's conduct, she stated that Keeling was harassing her for "unknown reasons" and did not make any reference to FMLA. *See Karibian*, 2008 WL 192259 at *5 (holding that plaintiff did not engage in protected activity where plaintiff attempted to

18

follow his employer's directive to terminate an employee returning from pregnancy leave but later made vague statements that he thought the directive was illegal.) Nor did Lee make comments at Jeup's performance reviews indicating that he was aware that she was refusing to follow his order to target FMLA users. *Cf. Brooks et al. v. Charter Twp. of Clinton et al.*, No. 12-cv-12880, 2015 U.S. Dist. LEXIS 133195, at *23 (E.D. Mich. Sept. 30, 2015) (holding evidence of protected activity sufficient where "Plaintiffs claim[ed] that they were engaged in activity protected by Title VII and the ELCRA since they opposed Defendant Fitzgerald's sexual harassment of Kim Irvine by refusing to participate *and by openly criticizing* his harassment" (emphasis added)). To the contraryy, Jeup testified that she told Lee that she would be open to staying at the Port Huron center if she could be transferred to a new supervisor, which suggests that her issue was with working under Keeling rather than some other reason. (Jeup Dep. at 106.)

Accordingly, the Court finds that Jeup has not established that she engaged in protected activity under FMLA for summary-judgment purposes.

*Constructive Discharge*

Even assuming that Jeup had engaged in protected activity, she has not met her burden to show constructive discharge. Jeup relies on Keeling's treatment of her to establish constructive discharge. Specifically, Jeup testified that Keeling was "verbally abusive" towards her. While Jeup admits that Keeling's behavior improved shortly after the investigation of the EEO Complaint, she says that Keeling reverted back to being abusive and told her that it was "you or them[.]" (Jeup Dep. at 93.) However, unlike in Brister's case, there is no evidence that the "you or them" comment ever manifested itself in any actual demotion or other materially adverse change in Jeup's employment status. And the record reflects that when Jeup complained about Keeling's conduct (EEO Complaint), Defendant took action to investigate and remedy the

problem. A reasonable employee in Jeup's position would not find these circumstances to be "objectively intolerable." *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) ("An employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged. Instead, the employee is obliged not to assume the worst, and not to jump to conclusions too fast." (citation and internal quotation marks omitted)). And given that Defendant responded to Jeup's initial complaint and all indications to upper management were that the issue was resolved (i.e., there were no further complaints), Jeup's resignation would not be reasonably foreseeable to her employer. Therefore, the Court finds that Jeup has not raised a genuine issue of material fact as to whether she was constructively discharged.

Thus, Court finds that, as a matter of law, Jeup was not constructively discharged.

*Causation*

Assuming Jeup had met her burden to establish protected activity and adverse action, Defendants say she cannot establish causation. "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). The Sixth Circuit "has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283–84 (6th Cir. 2012) (citing *DiCarlo*, 358 F.3d at 421)).

As stated above, Lee and Keeling's comments to Jeup are too ambiguous to establish a direct causal connection between any protected activity and Keeling's harassment. And the

record reflects that Keeling was verbally abusive towards all of her employees at some point or another, not just towards those who opposed the FMLA targeting. Indeed, there is evidence in the record to establish that Keeling's harassment was geared toward those employees who had "lower" sales numbers. (Proctor Dep. at 20.) Nor can Jeup rely on temporal proximity to establish a causal connection—according to her testimony, she opposed the FMLA directive from the beginning (i.e. 2010, when Lee first took over the Port Huron call center), but Keeling did not become her supervisor until April 2011. (Jeup Dep. at 20–21.)

For these reasons, the Court finds that Jeup has not established a prima facie case of FMLA retaliation. Summary judgment on her claim is therefore appropriate.

### B. PWCRDA Retaliation

The Michigan Persons with Disabilities Civil Rights Act provides that a person or persons shall not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." Mich. Comp. Laws Ann. § 37.1602(a).

> To establish a prima facie case of unlawful retaliation under § 602(a), a plaintiff must show: (1) that he engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Aho v. Dep't of Corr.*, 688 N.W.2d 104, 108 (2004) (citing cases).

A plaintiff's burden on the causation element is higher in the PWDCRA context than in the FMLA context: "a plaintiff must demonstrate that [her] participation in the protected activity was a 'significant factor' in the employer's adverse employment action, not merely that there was a causal link between the two events." *Id.* (citation omitted). Accordingly, "discriminatory

21

or adverse action will not suffice as evidence of retaliation unless the plaintiff demonstrates a clear nexus between such action and the protected activity." *Id.* (citation omitted). As the Sixth Circuit has stated, this means that a plaintiff must "show more than a temporal connection between his protected conduct and the adverse action[.]" *MacDonald v. United Parcel Serv.*, 430 F. App'x 453, 465 (6th Cir. 2011).

Given that the causation standard is higher in the PWDCRA context than in the FMLA context, and that Jeup could not meet the lower standard, the Court finds that Jeup cannot establish causation as to her PWDCRA claim.

As to Brister, Defendant points out that Lee had at least two motivations unrelated to disability leave for presenting Brister with her three employment options: (1) her performance issues, as evidenced by her "Does Not Meet" performance reviews, and (2) her refusal to follow allegedly unethical sales practices.

Even so, the Court finds that a reasonable jury could find that Brister's refusal to target disability leave-takers was a significant factor in her constructive discharge. First, Brister's poor performance reviews were attributed in significant part to the attendance issues of her staff. For example, her 2012 MidYear evaluation stated that "At the root of [the] problem continues to be a chronic attendance problem in her work group." (Brister 2012 Performance Review at 4.) And the attendance issues are intertwined with disability leave—disability leave would clearly allow representatives to be absent from work—and as stated above, a reasonable jury could conclude that the root of the stated attendance problem was leave-taking rather than absenteeism. And there is no evidence that Brister's refusal to follow unethical sales practices was the subject of any comment by Lee during her performance reviews. Accordingly, a reasonable jury could find that Brister's protected activity was a significant factor in her constructive discharge.

## IV. CONCLUSION

Jeup's failure to establish protected activity, constructive discharge, and causation forecloses both her FMLA-retaliation and PWDCRA-retaliation claims. Brister, however, has presented sufficient evidence on both of her claims. Accordingly, Defendant's motion for summary judgment (Dkt. 29) is GRANTED IN PART and DENIED IN PART. The remaining claims for trial are Brister's FMLA-retaliation and PWDCRA-retaliation claims. The Court will schedule a conference to set the trial date.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  January 7, 2016


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 7, 2016.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson

23